# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **DANE BARROS, SR. and HEATHER FERREIRA, Individually and as Co-Personal Representatives of the Estate of Their Minor Child, D.B.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**MATTEL, INC., a corporation, and FISHER-PRICE, INC., a corporation,**<br><br>**Defendants.** | Case No. |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, **DANE BARROS, SR.** and **HEATHER FERREIRA,** individually and as Co-Personal Representatives of the Estate of their minor child, **D.B.,** by and through their undersigned counsel, **JOHNSON BECKER, PLLC** and **MEEHAN, BOYLE, BLACK & BOGANOW, P.C.,** hereby submit the following Complaint and Demand for Jury Trial against Defendants **MATTEL, INC.,** a corporation ("Mattel"), and **FISHER-PRICE, INC.,** a corporation ("Fisher-Price"), and allege the following upon personal knowledge and belief, and investigation of counsel:

## NATURE OF THE CASE

1.      D.B. was born on January 29, 2021, at St. Luke's Hospital in New Bedford, Massachusetts. He was a healthy four-month-old baby boy, described by his pediatrician, Dr. Bender, as "smiling, playful, and alert and active" at his last wellness check on May 29, 2021, just four days before his death.

2.      On the morning of June 2, 2021, D.B.'s mother, Plaintiff Heather Ferreira, put him down for a nap, placing him on his back in the Rock 'n Play Sleeper. The Rock 'n Play had been given as a gift by the mother of D.B.'s father, Plaintiff Dane Barros, Sr. As D.B. napped, Heather did some chores around the apartment. She checked in on D.B. around 12:30 p.m. and saw that he was awake, content, and playing with his hands. After completing her chores, Heather began to prepare to leave the house with D.B. When she went into the bedroom to get him ready, she was horrified to find him unresponsive. Heather immediately started CPR and called 911. The emergency responders continued CPR and rushed D.B. to St. Luke's Hospital in New Bedford, but to no avail. D.B. was pronounced dead at 2:34 p.m. that day.

3.      For almost 10 years, Fisher-Price and its parent company, Mattel, marketed the Rock 'n Play Sleeper as a safe and convenient baby product. Yet, the Rock 'n Play Sleeper was defective and unreasonably dangerous from the time it hit the market. The product frequently caused children to suffer injury and death. Fisher-Price and Mattel knew about this risk, and about multiple deaths and injuries that had already occurred, but they continued to sell the product anyway. They insisted it was safe until they were forced to recall it on April 12, 2019.

4.      Plaintiffs did not learn of the recall until after their son, D.B., had died as a result of positional asphyxia in the Rock 'n Play Sleeper. A multitude of other children have also been killed or injured in Rock 'n Play Sleepers, all designed, manufactured, marketed, and sold by Fisher-Price and Mattel.

### THE PARTIES

5.      Plaintiffs Dane Barros, Sr. and Heather Ferreira are residents of New Bedford, Massachusetts and citizens of Massachusetts. They are the parents of the Decedent, D.B., who died

of positional asphyxia in a Rock 'n Play Sleeper on June 2, 2021, at home in New Bedford, Massachusetts, as a result of the defective design of the Rock 'n Play Sleeper.

6.      Defendant Fisher-Price is a Delaware corporation with its principal place of business at 636 Girard Avenue, East Aurora, New York 14052. For purposes of diversity jurisdiction, Fisher-Price is a citizen of the States of Delaware and New York. Fisher-Price designs, manufactures, markets and sells products for the infant and preschool markets, including the Rock 'n Play Sleeper. Fisher-Price is a wholly owned subsidiary of Defendant Mattel.

7.      Defendant Mattel is a corporation organized under the laws of the State of Delaware with its principal place of business at 333 Continental Boulevard, El Segundo, California 90245. For purposes of diversity jurisdiction, Mattel is a citizen of the States of Delaware and California. Mattel is the world's second largest toy maker and the corporate parent of Fisher-Price. Mattel refers to Fisher-Price as a "brand" in "Mattel's portfolio of global brands" in its annual filings with the Securities and Exchange Commission.

8.      Plaintiffs plead no causes of action arising under federal law, and specifically disclaim any causes of action arising under federal law.

### JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this case pursuant to diversity jurisdiction prescribed by 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity between the parties.

10.      This Court has specific personal jurisdiction over Defendants Mattel and Fisher-Price because they have purposefully availed themselves of the benefits and protections of Massachusetts by regularly and systematically marketing and selling their products in Massachusetts, including the Rock 'n Play Sleeper; by transacting business in Massachusetts; by

contracting to supply services or things in Massachusetts; by causing tortious injury by an act or omission in Massachusetts; and by causing tortious injury in Massachusetts by an act or omission outside of Massachusetts, and regularly doing and soliciting business and engaging in other persistent courses of conduct and deriving substantial revenue from goods used or consume or service rendered in Massachusetts.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to this claim occurred in this district.

## FACTUAL BACKGROUND

### GENERAL OVERVIEW

12.     The Rock 'n Play Sleeper is an inclined sleeper: a sleeping product for babies with the sleeping surface inclined upwards at approximately a 30-degree angle, which raises the baby's head and torso.  A November 26, 2018, Wall Street Journal article entitled *Infant Deaths Prompt Questions Over Safety of Inclined Sleepers*, noted that dozens of deaths and hundreds of injuries associated with inclined sleepers have been reported to the Consumer Product Safety Commission ("CPSC") since 2005. The Rock 'n Play Sleeper was by far the most popular inclined sleeper in the United States.

### DEVELOPMENT OF THE ROCK 'N PLAY SLEEPER

13.     In 2008, a Fisher-Price product designer, Linda Chapman, came up with the idea of an inclined sleeper for babies with reflux and congestion. The Rock 'n Play Sleeper uses a collapsible frame that supports a fabric hammock with tall sides, forcing the infant into a reclined position, with the head elevated at an approximately 30-degree angle from the lowest part of the baby's torso. There are also restraints that, if used as Defendants recommended, limit the baby's motion. A hard-plastic shell inside the fabric hammock is covered with soft padded material on which the baby rests.

14.     Michael Steinwachs was the Engineer for Product Integrity on the Fisher-Price development team for the Rock 'n Play Sleeper. His primary role at Fisher-Price was to "be involved in the development of the new products and advise the development team on what types of standards and regulations would need to apply to the product." He has testified that the Rock 'n Play Sleeper Product Integrity Team never determined what incline is *safe* for infant sleep. Instead, the team chose the 30-degree incline simply because it was less than the 45-degree incline applicable to many car seats.

15.     When asked if there was any medical evidence to support the Rock 'n Play Sleeper's ability to address a baby's acid reflux and congestion, he testified "I don't believe we had medical evidence…."

16.     The Washington Post reported on May 31, 2019, "[r]ather than seeking the advice of pediatricians, [Fisher-Price] consulted just a single doctor – [Dr. Gary Deegear,] a family physician from Texas whose expertise had already been doubted by judges and who would eventually lose his medical license."

17.     Kitty Pilarz, Director of Public Safety at Fisher-Price, testified "I'm not sure that we did specific research at this time about incline angles other than talk to Dr. Deegear." Ms. Pilarz received at least two pieces of research from Dr. Deegear. One of them was "A Parent's Guide to Safe Sleep" issued by the American Academy of Pediatricians (AAP), which stated, "Always place babies to sleep on their backs during naps and at nighttime," and included an illustration of a baby sleeping ***flat*** in a ***non-inclined crib.***

18.     Ms. Pilarz also testified that she did not research how different inclines could impact an infant's respiration. In June 2009, months before Fisher-Price introduced the Rock 'n Play Sleeper to the market, Dr. Deegear recommended Fisher-Price bring a prototype to a medical conference so that other doctors could see it, but Defendants did not do so.

19.     The first time Fisher-Price hired a pediatrician to evaluate the Rock 'n Play Sleeper was eight years later, as part of the company's defense in a product liability lawsuit. In a personal injury case brought on behalf of an infant who was injured in a Rock 'n Play Sleeper, Ms. Pilarz testified that Fisher-Price did not have medical professionals on staff other than Dr. Deegear, the non-pediatrician who ultimately lost his medical license.

20.     Despite the lack of evidence showing the Rock 'n Play Sleeper was safe, Defendants continued with development and introduced the Rock 'n Play Sleeper to the United States market in 2009. It was kept on the market for almost 10 years, while multiple standards were issued showing that the Rock 'n Play Sleeper was an unsafe sleep environment for infants.

**DEFENDANTS MANIPULATED SAFETY STANDARDS FOR INCLINED SLEEPERS**

21.     In addition to failing to take any meaningful steps to ensure that the Rock 'n Play Sleeper was safe, Defendants also actively manipulated safety standards applicable to the Rock 'n Play Sleeper so they could keep selling it.

22.     The Consumer Product Safety Improvement Act of 2008, Public Law 110-314 ("CPSIA"), was enacted on August 14, 2008. Section 104(b) of the CPSIA requires the CPSC to promulgate consumer product safety standards for durable infant or toddler products.

23.     When the Rock 'n Play Sleeper was designed in 2009, there was no federal standard applicable to it. The CPSC then became interested in regulating bassinets and cradles in 2010, and wanted to include a limitation on inclined sleeping surfaces. In April 2010, under then Chairwoman Inez Tenenbaum, the CPSC published a notice of proposed rulemaking with the intention of creating regulations that were stricter than a voluntary standard developed by ASTM International ("ASTM").

24.     The CPSC was particularly concerned about infant hammocks and bassinets, some of which had been recalled due to suffocation hazards. The CPSC investigation was motivated in

part by a 1995 Australian study that videotaped the behavior of healthy infants sleeping in a variety of sleep products and concluded that in order to be considered safe, cradles cannot incline more than 5 degrees.

25.    The CPSC's 2010 proposed rule would have prohibited any sleeper with an incline of more than 5 degrees, and would also have banned restraints because "[i]nfants lying on a flat surface do not need restraints and the use of restraints could contribute to a possible strangulation hazard." The 2010 proposed rule would also have "clarif[ied] that bassinets should not include any restraining system that requires action on the part of the caregiver to secure the restraint."

26.    Had the CPSC's proposed incline rule included "inclined sleepers," the Rock 'n Play Sleeper, with its 30-degree incline, would have been banned. To avoid that, Defendants lobbied the CPSC to carve out inclined sleepers from the new rule. In doing so, they misled the CPSC by providing it with out-of-date standards that had long since been repudiated by the bodies originally issuing them.

27.    On July 12, 2010, Fisher-Price's Kitty Pilarz submitted an eight-page letter on Defendants' behalf in response to the CPSC's request for public comment on its proposed new bassinet standard. Ms. Pilarz relied on a newsletter that she quoted as suggesting "elevating the head of the crib and diaper changing table to 30 degrees so they never lay flat" for infants who regurgitate. However, that newsletter, written by the North American Society for Pediatric Gastroenterology, Hepatology and Nutrition (PDHN), had been withdrawn by the time Fisher-Price wrote its letter to the CPSC. By 2010, PDHN had changed its advice to warn that inclining babies for sleep was harmful. The reason for the change was that there was new data showing that inclined positioning was no longer recommended for infants.

28.    The final CPSC rule, promulgated in October 2013, granted Fisher-Price and Mattel the victory for which they had lobbied. The rule carved out an exemption for the Rock 'n Play

Sleeper by removing inclined sleepers from the CPSC's rule and deferred the regulation of inclined sleepers with more than a 10-degree incline to the ASTM subcommittee on inclined sleepers. It is no coincidence that the ASTM subcommittee was chaired by Fisher-Price's very own Mr. Steinwachs.

29.    It took the ASTM five years to issue voluntary standards for inclined sleepers, and those standards were issued despite objections from consumer advocates and the AAP as to their adequacy.

30.    In May 2015, the ASTM issued standards that permitted the continued marketing and sale of the Rock 'n Play Sleeper. The ASTM's press release announcing the standards suggested that ASTM bowed to a popularity contest: "ASTM member Mike Steinwachs, senior manager, quality engineering, Fisher-Price, notes that use of infant inclined sleep products has become popular as parents sometimes feel that babies sleep better on an incline rather than flat surface."

31.    After the Rock 'n Play Sleeper was recalled in April 2019, Mr. Steinwachs immediately stepped down from his position at the ASTM. Safety experts have criticized regulators for failing to address inclined sleepers. This failure appears to have resulted, at least in part, from the close relationship between Defendants and these regulators.

## RESPONSES TO CPSC'S 2017 REQUEST FOR COMMENT ON INCLINED SLEEPERS

32.    In February 2017, the CPSC proposed rulemaking for infant inclined sleep products, and invited public comment. The AAP and numerous other respected consumer protection groups responded, detailing the dangers of these products.

33.    An AAP comment letter dated July 5, 2017, stated that "the AAP has concerns about all inclined sleep products and the hazards they may pose to infants." The AAP drew an analogy to "car safety seats, strollers, swings, infant carriers and infant slings, which are also not

recommended for routine sleep," noting that "[i]nfants who are younger than four months are particularly at risk, because they might assume positions that can create risk of suffocation or airway obstruction."

34.    On June 13, 2018, the AAP and other groups joined in another public letter to the CPSC detailing the dangers of inclined sleepers. The letter expressed concern about "inherently unsafe inclined sleep products, the use of which does not align with American Academy of Pediatrics (AAP) safe sleep recommendations."

35.    Despite these developments, Defendants continued to market and sell their dangerous inclined Rock 'n Play Sleeper as safe for sleep, including overnight and prolonged sleep, thereby knowingly putting an untold number of babies at risk.

## CANADA AND AUSTRALIA PROHIBITED SALE OF THE ROCK 'N PLAY AS A "SLEEPER"

36.    In 2011, Canadian and Australian regulators prohibited Defendants from selling the Rock 'n Play Sleeper as a "sleeper" within their countries. This demonstrates that Defendants knew foreign regulators considered their Rock 'n Play Sleeper to be dangerous, and thus, that Defendants' marketing of the Rock 'n Play Sleeper as "safe" in the U.S. was false and misleading.

## PEDIATRICIANS WARNED FISHER-PRICE ABOUT THE ROCK 'N PLAY

37.    Multiple individual pediatricians also warned Fisher-Price about the dangers of the Rock 'n Play Sleeper. For instance, pediatrician Dr. Natasha Burgert – who has since become the AAP's National Spokesperson – wrote an open letter to Fisher-Price in 2012, stating:

> *As a pediatrician and parent consumer, I believe it irresponsible to promote the Rock 'n Play™ Sleeper as an [sic] safe, overnight sleeping option for infants. By continuing to do so, you are putting babies at risk.*

(All emphasis in original.)

38.     In 2015, Rachel Coley, a pediatric occupational therapist, cited Dr. Burgert's letter on her website, Can Do Kiddo,[81] and addressed the issue from her professional perspective:

> New parents LOVE the Rock 'n Play™. How do I know? Because it's included as an "essential," "must-have," "lifesaver" item among nearly all baby registry recommendations. I also know because so many of the parents I personally know (and love) use the Rock 'n Play as their babies' first sleeping spot - conveniently compact and within arm's reach of new mama. Unfortunately, I also know that new parents love the Rock 'n Play™ because I'm a pediatric Occupational Therapist. **A startling number of the babies referred for therapy services for head flattening, neck tightness and motor development issues have spent LOTS of their time sleeping and playing in this piece of baby gear.**

(Emphasis in original.)

39.     Another pediatrician, Dr. Roy Benaroch, reported about his communications with Fisher-Price on his blog. In 2013, he exchanged emails with Fisher-Price about the Rock 'n Play Sleeper's failure to meet the AAP's standards for safe sleep. Dr. Benaroch wrote that "[t]he Newborn Rock 'n Play Sleeper does not keep a baby wholly on the back, but rather in an inclined position. It is not a safe way for babies to sleep."  He also noted that the AAP guidelines provide that "[s]itting devices, such as car safety seats, strollers, swings, infant carriers, and infant slings, are not recommended for routine sleep in the hospital or at home," and told Fisher-Price that, "[t]hough this sentence doesn't specifically mention your product, the Newborn Rock 'n Play Sleeper is shaped like the devices in this category, and is therefore not recommended for sleep."

40.     Dr. Benaroch reported that Fisher-Price responded, stating, "Thank you for your inquiry and comments. We did receive your email on February 7, 2013. We have provided these comments to the appropriate people within Fisher-Price. The Rock 'n Play Sleeper complies with all applicable standards."

## MANY OTHER SIMILAR INCIDENTS OF INFANT DEATH AND INJURY HAVE BEEN REPORTED WITH THE ROCK 'N PLAY SLEEPER

41.     The Wall Street Journal reported in November 2018 that more than 30 deaths and 700 injuries have occurred as a result of the use of inclined sleepers like the Rock 'n Play Sleeper.

A follow-up article in the Washington Post reported that as of October 2019, the reported death toll had risen to 59 babies. It has increased further since, and many other complaints from customers regarding infant injury have also been reported.

## DEFENDANTS' BELATED RECALL

42.     Defendants finally recalled the Rock 'n Play Sleeper on April 12, 2019. The recall notice admitted Defendants' knowledge of the deaths:

> ***Infant fatalities have occurred in Rock 'n Play Sleepers, after the infants rolled from their back to their stomach or side while unrestrained, or under other circumstances.***

(Emphasis in original.) Defendants also advised, "**If you own a Rock 'n Play Sleeper, discontinue use of the item immediately.**" (Emphasis in original.)

43.     Consumer advocates continued to express their outrage about the Defendants' wrongful conduct. An April 12, 2019, press release by Consumer Reports quotes its President and CEO, Marta Tellado, as stating, "The Fisher-Price recall of the Rock 'n Play is long overdue. Fisher-Price and the CPSC ***knew about deaths linked to this product for years and could have taken steps to avoid this unnecessary tragedy***." The press release also quotes William Wallace, Senior Policy Analyst for Consumer Reports, as stating "While we are glad to see all Rock 'n Play Sleepers recalled, ***Fisher-Price and its parent company Mattel misled parents and caregivers by marketing this product as safe for sleep...***"

## DEFENDANTS' DECEPTIVE MARKETING

44.     Defendants repeatedly deceived consumers by misrepresenting that the Rock 'n Play Sleeper was suitable for safe overnight infant sleep. This deception occurred in a number of ways: by generally misrepresenting that Fisher-Price had an overall commitment to safety when it did not; by generally misrepresenting that Fisher-Price appropriately addressed safety issues when it did not; by misrepresenting on the product box that the Rock 'n Play Sleeper was safe when it

was not; by misrepresenting in online marketing that the Rock 'n Play Sleeper was safe when it was not; and by misrepresenting the Rock 'n Play Sleeper as safe in the product's literature when it was not.

45.     Defendants' marketing for the Rock 'n Play Sleeper was pervasive, with online advertising on the Fisher-Price website as well as other websites where the product was sold (e.g., Amazon.com). In-store advertising also appeared in the many stores where the Rock 'n Play Sleeper was sold. And millions of the Rock 'n Play Sleepers were sold.

46.     The deceptive marketing of the Rock 'n Play Sleeper started with the use of "*Sleeper*" in the product name. By calling the product a "Sleeper," Defendants misled consumers into believing the product was safe for infant sleep. Reasonable consumers would assume the Rock 'n Play Sleeper's design was consistent with applicable guidelines and recommendations about how babies should sleep. Reasonable consumers would also assume that a company like Fisher-Price, which claims that safety is a priority, would have designed the product with appropriate medical guidance and safety testing. However, as shown above, the Rock 'n Play is unfit for use as an infant sleeper. It exposes infants to the risk of injury and death.

### A.     *Defendants' False and Misleading Representations About Safety*

47.     Defendants misled buyers and users of Rock 'n Play Sleepers by having safety be a central component of their brand image.

48.     For example, Defendant Fisher-Price has a webpage dedicated to safety. This page, titled "A Safety Story," states:

**It All Starts With Safety**
Squeals of delight, sighs of contentment, giggles of joy . . . those are some of the reactions we hope for from families using our baby gear and toys. There's a less visible one, too: peace of mind.

"Parents have trusted us for more than 80 years to provide safe products for their children, but we know we must still earn their trust every day," says Kitty Pilarz, Vice President of Product Safety & Regulatory Compliance at Fisher-Price. "So,

right from the start of a design concept, we work to make sure our products are as safe as they can be."

**To standards and beyond**

There's an entire team of quality engineers who work closely with design groups to make sure every product not only meets U.S. safety regulations and international standards, but lives up to the traditionally high Fisher-Price standards of quality, as well as consumer expectations. A significant amount of testing is done all along the way.

49.     This is false. For all of the reasons set forth in this complaint, the Rock 'n Play Sleepers are not "as safe as they can be," and instead are dangerous for the purpose for which they are advertised: all night sleep.

50.     The "Safety Story" continues:

**Listening to consumers**

"We welcome feedback from consumers—it's critical to helping us make better products," says Gary Cocchiarella, Director of Consumer Services. "Families don't hesitate to share their opinions, so we collect, analyze and share their comments with our teams. That way, we can detect and solve problems quickly, as well as improve our design and manufacturing processes."

51.     This is also false. Defendants did not modify the Rock 'n Play Sleeper for a decade despite complaints from parents about its safety, documented reports of infant death and injury from its use, and warnings from pediatricians and consumer protection advocates that inclined sleepers like the Rock 'n Play Sleeper are dangerous.

52.     The dominant message on Defendants' website is also safety. The website states that the most important part of creating its products is to make sure they are safe. Defendants also claim that their internal product safety procedures are designed to meet or exceed applicable regulations and laws.

53.     Parents' trust is essential for Defendants' success because parents buy Defendants' products. Accordingly, Defendants advertise their commitment to safety, with assurances that their products comply with all safety standards.

54.     According to Chuck Scothon, General Manager of Fisher-Price: "Fisher-Price has a long, proud tradition of prioritizing safety as a cornerstone of our mission."

55.     Defendants' marketing convinced parents and other purchasers of Rock 'n Play Sleepers that they had been tested and complied with all applicable regulations and laws, and were fit for their intended use.

56.     This type of false and misleading messaging is also reflected in Defendants' direct interactions with consumers. For example, on February 1, 2019, just over two months before the April 12 recall, Mattel Consumer Services representative Stefanie W. responded to a consumer's request for a refund after learning of the many infants who died while using Rock 'n Play Sleepers. The following form letter sent from a corporate e-mail address, FisherPriceBabyGearConsumerRelations@mattel.com:

> ***We can assure you that the Rock 'n Play Sleeper is safe for inclined sleep, including overnight sleep, when used according to the instructions***. And we understand it can be confusing to hear an American Academy of Pediatrics recommendation that may seem to conflict with a product designed for inclined sleep. But maybe this will help clarify: what the AAP states is that sitting devices - car seats, strollers, swings, infant carriers and infant slings - are not recommended for routine sleep in the hospital or at home.
>
> The Rock 'n Play Sleeper is not a sitting device - it is a product specifically designed for inclined sleep. As such, it meets all applicable industry safety standards, including those of the international standards organization known as the ASTM.
>
> We hope that clears up any confusion you may have had….

(Emphasis added.)

**B.     *The Rock 'n Play Sleeper Product Box***

57.     One of the important ways of advertising the Rock 'n Play Sleeper was the language and imaging on the product box. The boxes prominently represented that the product was suitable for all-night sleep. That was also depicted on the packaging, which showed infants sleeping in the Rock 'n Play Sleeper.

58.     The marketing statements on the packaging conflict with the AAP's guidelines and recommendations, and those of other infant sleep experts.

59.     Instances of this include Defendants' statements that "Baby can sleep at a comfortable incline all night long!"; and "Comfortable incline for babies that need it"; and "Incline or Recline – Choose the position that baby likes best." These statements are contrary to the AAP's guidelines and recommendations that babies sleep supine, flat on their backs, and that their heads not be elevated.

60.     Defendants also represented that the Rock 'n Play Sleeper had "Extra-plush fabrics for extra-comfy sleep," which is contrary to the AAP's guideline and recommendation that soft materials should not be placed under a sleeping infant.

61.     Defendants' representation that the Rock 'n Play Sleeper is a "Nighttime sleeper and playtime seat!" and an "Adjustable seat for all-night sleep!" is contrary to the AAP's guideline and recommendation that sitting devices are not recommended for routine sleep. Similar statements appeared on all of Defendants' packaging for the Rock 'n Play Sleeper at all relevant times.

62.     Defendants' misrepresentations and deceptive marketing practices characterizing the Rock 'n Play Sleeper as a "Sleeper" safe for infant sleep, including overnight or prolonged sleep, were material to consumers' decisions to buy the product or request it as a gift. The misrepresentations and deceptive marketing practices caused consumers to reasonably believe the product was safe. The Rock 'n Play Sleeper should never have been marketed as a "Sleeper" suitable for infant sleep, including prolonged or overnight sleep. Defendants should also have disclosed in their marketing statements that using the product for sleep, including prolonged or overnight sleep, is dangerous and contrary to medical guidelines and recommendations, since that

information would have been material to consumers' decisions about buying a Rock 'n Play Sleeper or requesting one as a gift.

### C.    *Defendants' Deceptive Online Marketing of the Rock 'n Play Sleeper*

63.    Defendants' marketing on the www.fisher-price.mattel.com website represented the Rock 'n Play Sleeper as a "Nighttime sleeper and playtime seat in one! This inclined sleeper rocks! The supportive, angled seat back keeps baby elevated for playtime and inclined sleep (the way some babies sleep best!), to help baby sleep allllll [sic] night long," also conflicted with the AAP's guidelines and recommendations.

64.    The product webpages for the Rock 'n Play Sleeper on Defendants' website were repeated in various forms on the websites of most of the product's other distributors, like Amazon and Target. Misrepresentations were made on those websites similar to those made on the product box. For instance, on Amazon.com, the Rock 'n Play Sleeper was described as "an inclined baby seat that helps little ones sleep all naptime or nighttime long," describing the product as "a Sleeper & playtime seat in one," and saying that parent and child "both could be sleeping in no time."

65.    These webpages also stated: "The inclined seat helps baby sleep all night long; "an extra deep seat helps baby sleep all night long;" and "This sleeper helps give your little one the customized soothing motions he or she loves, so you both can get some much-needed shut-eye."

66.    The webpages also showed pictures of mothers lying down in bed with their babies in Rock 'n Play Sleepers next to them, assuring mothers they could sleep while their babies slept peacefully in the product. These statements and images are misleading for the same reasons the images on the boxes are misleading.

### D.     Defendants' In-Box Label Is Also Materially Misleading

67.     The information Defendants put inside the box for the Rock 'n Play Sleeper did not disclose the inherent dangers of the product and was phrased to be intentionally misleading. These in-box disclosures also made recommendations that parents were not able to follow.

68.     There is a warning label attached to the soft padded material inside the box for the Rock 'n Play Sleeper that cannot be read, even if it is noticed, until the product is removed from the box. Because a parent cannot see the warning label until after opening the box, the statements on the padding label could not inform a consumer's decision about whether to buy the product, even if they were adequate warnings – which they are not. Even if the disclosures were on the outside of the box, they would be insufficient and useless due to numerous dangerous omissions that render them materially misleading.

69.     First, Defendants' label stated that infants have suffocated "on *added* pillows, blankets and extra padding" (emphasis added), leading parents to reasonably think the padding that comes with the Rock 'n Play Sleeper is safe and cannot cause suffocation. This statement is followed by another statement that instructs the user to "Use ONLY the pad provided by Fisher-Price. NEVER place extra padding under or beside infant." However, as Defendants know, the AAP guidelines state that *any* soft material under a baby can cause suffocation. Numerous instances of babies suffocating because of the padding that comes with inclined sleepers have been reported.

70.     Defendants also omitted the material fact that babies can die due to positional asphyxia. This can occur when a baby tips to one side and, because of an inclined back position, is unable to pull herself out of that position. The face can either press into the soft fabric of the sides, or the neck can be bent at such an angle that oxygen cannot get through.

71.     Defendants' padding label also omitted the fact that products like the Rock 'n Play Sleeper are dangerous because they purport to solve a problem that should not be solved – getting an infant to sleep all night. As explained in an April 15, 2019, article in The New Yorker by Rachel Moon, the chair of the AAP Task Force on SIDS, "Babies are not supposed to sleep through the night," and products that are supposed to "make babies 'sleep better,' quote-unquote, are dangerous because they make babies sleep more deeply, and, with SIDS, when they sleep more deeply, they can't wake up."

72.     Defendants also misled parents while skirting the AAP's guidelines by warning them to "ALWAYS place child on back to sleep." That warning omitted the crucial fact that infants should always be placed supine – ***flat on their backs*** – for sleep, including overnight or prolonged sleep, and that allowing babies to sleep on an incline is dangerous. Defendants disregarded the language in the AAP guidelines stating, "If an infant falls asleep in a sitting device, he or she should be removed from the product and moved to a crib or other appropriate flat surface as soon as is practical." Since the Rock 'n Play Sleeper was marketed as an overnight sleeper, reasonable parents could not be expected to conclude that the warning meant anything other than placing the infant on its back ***in the sleeper***.

73.     It is significant that this supposed warning is not listed under the "suffocation hazard," which only mentions using an additional layer of padding, but is listed separately. Accordingly, Defendants omitted any clear explanation of the asphyxiation hazard that the AAP guidelines are designed to prevent.

74.     Defendants also warn that parents should "always use the restraint system," but they inexplicably fail to disclose that the use of restraints on babies in the Rock 'n Play Sleeper does not render the Rock 'n Play safe and, indeed, is in itself dangerous. Defendants omit the material fact that deaths and injuries have occurred when using restraints on a baby in the Rock 'n

Play Sleeper. They also fail to disclose that strapping a baby for up to 16 hours at a time in a sleeper can result in physical deformities of the baby's head and neck.

75.     In a particularly cruel twist, Defendants further state that parents should "always provide the supervision necessary for the continued safety of your child." This instruction is impossible to comply with because a sleeping parent is in no position to supervise her child, and the Rock 'n Play Sleeper was specifically promoted as an all-night sleeper. Some of Defendants' public statements actually marketed the Rock 'n Play Sleeper as *suitable for unattended sleep*.

76.     Finally, Defendants advise parents that "[w]hen used for playing, never leave a child unattended," which suggests that a parent could safely leave the child unattended when the sleeper was not being used for play — such as when the infant is sleeping.

### E.     Defendants' User Manual Is Also Materially Misleading

77.     The user manuals for Rock 'n Play Sleepers are substantially similar in all material respects, and they also contain misrepresentations, misleading statements, and omissions. These manuals are placed inside the boxes in which the products were sold. As with the label on the padding, this means that the manual cannot be read until the product is removed from the box.

78.     Like the warning label on the padding, the user manual's warning omits the material risk that use of the Rock 'n Play Sleeper can result in positional asphyxia.

79.     Again, like the warning label on the padding, the user manual warning instructs consumers to always use the restraints, but it does not disclose that keeping a baby restrained for extended periods of time can result in deformations to the head or neck.

80.     And again, like the warning label on the padding, the user manual warning instructs users to "always provide the supervision necessary for the continued safety of your child," but ignores the fact that this is impossible when the baby is in the Rock 'n Play Sleeper for sleep, or when the caregiver is asleep when the baby is in the product.

81.    The warning section in the user manual also includes slight variations on the language used in the label on the padding, but the overall impact is just as misleading. For example, the warning section in the manual uses the acronym "SIDS" and states that, "[t]o reduce the risk of [SIDS], pediatricians recommend healthy infants be placed on their backs to sleep," but it does not say that the recommendation is actually that babies should be flat on their backs and not on an incline.

82.    In addition, the warning section in the manual states:

ALWAYS use the pad provided, which includes the restraint.

NEVER add mattress, pillow, comforter, or padding.

SUFFOCATION HAZARD: – Infants can suffocate:

- in gaps between an extra pad and the side of the product.

- on soft bedding.

This warning is misleading because it does not disclose that the pad that comes with the product and the soft fabric walls that are a part of the product themselves pose a risk of suffocation.

83.    The user manual is also misleading in other ways. For example, the manuals show images of mothers lying down in bed, covered with blankets, which indicates either that they are ready for sleep or awakening from sleep. Those images are misleading because they imply that mothers can sleep when their babies are in the sleepers, but that is completely inconsistent with Defendants' warning that babies should be supervised when in a Rock 'n Play Sleeper. Mothers cannot supervise their children when they are themselves asleep.

84.    The user manuals also contain a section called, "Preventing Baby's Head from Flattening." This Section is misleading due to misrepresentations and omissions. For instance:

Pediatricians and child health organizations agree that healthy babies should be placed on their backs to sleep for naps and at nighttime, to reduce the risk of Sudden Infant Death Syndrome (SIDS). But babies who are always on their backs can sometimes develop flat spots on their head (plagiocephaly) . . .

This statement is misleading because it does not say that pediatricians recommend babies be flat on their back, thereby falsely implying that having a baby sleeping on its back at an incline is consistent with medical recommendations.

85.    The manual also instructs users:

Change the location of your baby's sleeper or crib in the room, so she has to look in different directions . . .

This is also misleading because it implies that sleepers and cribs are equally safe. It does not acknowledge that additional risks are presented by the baby being strapped in and laying at an incline in a Rock 'n Play Sleeper.

86.    The user manual also recommends:

Help your baby avoid resting his head in the same position all the time by frequently changing the direction he lies in the crib. For example, have your baby's feet point toward one end of the crib for a few days, and then change the position so his feet point toward the other end of the crib. This will encourage your baby to turn and look in different directions.

This, of course, is impossible in a Rock 'n Play Sleeper. A baby is not supposed to be in a sleeper with its feet in the elevated end and its head dangling below. Again, Defendants do not acknowledge that a Rock 'n Play Sleeper is not a crib, or that it is less safe than a crib, or that a crib allows the baby to sleep supine and horizontal, while the Rock 'n Play Sleeper does not.

87.    The manual further recommends:

Try to minimize the amount of time your baby spends in car seats, carriers and bouncy seats while awake.

This statement is materially misleading because it omits "sleepers" from this list, although inclined sleepers pose the same risks as the other devices that Defendants listed. In another attempt to differentiate the Rock 'n Play Sleeper from the listed group of products, Defendants suggest parents minimize the amount of time their babies spend in these products while awake.

SUMMARY

88.     In short, Defendants knew at all relevant times about the serious risks their Rock 'n Play Sleeper posed to babies. They knew that the Rock 'n Play Sleeper was unfit for its intended use for infant sleep, including overnight or prolonged use. They knew they were prevented from marketing the Rock 'n Play as a "sleeper" at all in Canada and Australia. Yet Defendants still introduced the Rock 'n Play Sleeper to the United States market as an infant sleeper, relying on the material misrepresentations and omissions described above.

**CLAIMS FOR RELIEF**

**COUNT I**
**WRONGFUL DEATH – NEGLIGENCE / GROSS NEGLIGENCE**

89.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully herein.

90.     Defendants owed a duty of reasonable care to the general public, including Plaintiffs, when they designed, manufactured, assembled, inspected, tested, marketed, placed into the stream of commerce and sold the Rock 'n Play Sleeper, to protect users from an unreasonable risk of harm, including death, when using the product for its intended purpose.

91.     Defendants breached this duty by designing, manufacturing, assembling, inspecting, testing, marketing, distributing and selling the Rock 'n Play Sleeper in a defective and unreasonably dangerous condition, including its foreseeable risk of harm, including death, caused by positional asphyxia.

92.     Defendants knew or should have known of the dangerous and defective nature of the product, yet failed to acknowledge, and in fact intentionally ignored and lobbied against, well-accepted medical authority advising that the design of the Rock 'n Play Sleeper posed a danger of serious injury and death to infants when used for its intended purpose.

22

93.     Defendants were negligent, grossly negligent, careless and/or reckless by callously disregarding appropriate design procedures and blatantly ignoring safety guidelines regarding safe infant sleep.

94.     Defendants were negligent, grossly negligent, careless and/or reckless in advertising, marketing, promoting, packaging and selling the Rock 'n Play Sleeper as safe for infant sleep, despite substantial and mounting evidence to the contrary.

95.     As a direct and proximate result of the Defendants' breach of their duty of care as aforesaid, the Plaintiffs' decedent suffered from positional asphyxia caused by the Rock 'n Play Sleeper, which led to his untimely death. His next of kin have been deprived of his love, services, protection, care, assistance, society, comfort, companionship, guidance, counsel, advice and financial assistance. His family has incurred funeral, burial and other expenses related to his death and his next of kin and Estate have been deprived of the economic value of his capacity to earn money during the normal span of his life.

**WHEREFORE,** Plaintiffs Dane Barros, Sr. and Heather Ferreira, as Co-Personal Representatives of the Estate of D.B., pursuant to the Massachusetts Wrongful Death Act, Mass. Gen. L. c. 229 § 2, pray that judgment be entered against Defendants in an amount that will fairly and adequately compensate D.B's next of kin for his death and award all other recoverable damages, including punitive damages, together with interest, costs, attorneys' fees and such other relief as may be appropriate.

## COUNT II
## BREACH OF WARRANTY

96.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully herein.

97.     Defendants were at all relevant times merchants that sold Rock 'n Play Sleepers and expressly and/or impliedly warranted to foreseeable users that the product and its component

23

parts were merchantable, fit, safe and in the proper condition for the ordinary use for which it was intended and used.

98.   Defendants had reason to know the foreseeable and particular purpose for which the Rock 'n Play Sleeper would be used, and that the Plaintiffs were relying on Defendants' skills and judgment to furnish suitable goods for that purpose.

99.   The Rock 'n Play Sleeper, its component parts, warnings and/or instructions, were sold by the Defendants in an unreasonably dangerous and defective condition to the mother of Plaintiff Dane Barros, Sr., who gifted the product to Plaintiffs, and therefore the product was not, in fact, merchantable, safe and fit for its ordinary, intended and foreseeable use as warranted.

100.   As a direct and proximate result of the Defendants' breach of implied and/or express warranties as aforesaid, the Plaintiffs' decedent, D.B., suffered from positional asphyxia caused by the Rock 'n Play Sleeper, which led to his untimely death. His next of kin have been deprived of his love, services, protection, care, assistance, society, comfort, companionship, guidance, counsel, advice and financial assistance. His family has incurred funeral, burial and other expenses related to his death and his next of kin and Estate have been deprived of the economic value of his capacity to earn money during the normal span of his life.

**WHEREFORE,** Plaintiffs Dane Barros, Sr. and Heather Ferreira, as Co-Personal Representatives of the Estate of D.B., pursuant to the Massachusetts Wrongful Death Act, Mass. Gen. L. c. 229 § 2, pray that judgment be entered against Defendants in an amount that will fairly and adequately compensate D.B's next of kin for his death and award all other recoverable damages, including punitive damages, together with interest, costs, attorneys' fees and such other relief as may be appropriate.

## COUNT III
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## (PLAINTIFF HEATHER FERREIRA)

101.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully herein.

102.    As a result of the Defendants' aforesaid negligence, gross negligence and breaches of warranty, Plaintiff Heather Ferreira found her son unresponsive, causing her to suffer severe emotional distress, including multiple symptoms of physical harm caused by the mental distress.

**WHEREFORE,** Plaintiff Heather Ferreira prays that judgment be entered against the Defendants in an amount which will fairly and adequately compensate her, including interest, costs, attorneys' fees and such other relief as the Court may deem appropriate.

## PLAINTIFFS' DEMAND FOR TRIAL BY JURY

PLAINTIFFS DEMAND TRIAL BY JURY ON EACH CLAIM ASSERTED, AND ON EACH DEFENSE SO TRIABLE, AND FURTHER RESPECTFULLY DEMAND VOIR DIRE BY COUNSEL OF THE JURY VENIRE.

The Plaintiffs,

By Their Attorneys.

**MEEHAN, BOYLE, BLACK & BOGDANOW,  P.C.**

*/s/Robert F. Foster*
Robert F. Foster, Esq.; MA BBO No. 697532
100 Cambridge Street, Suite 2101
Boston, MA, 02114
TEL:   (617) 523-8300
FAX:   (617) 523-0525
rfoster@meehanboyle.com

DATED:        May 29, 2024

*In association with*:

**JOHNSON BECKER, PLLC**

Michael K. Johnson, Esq. (MN #0258696)
    *Pro Hac Vice to Be Filed*
Kenneth W. Pearson, Esq. (MN #016088X)
    *Pro Hac Vice to Be Filed*
444 Cedar Street, Suite 1800
St. Paul, MN 55101
TEL:  (612) 436-1800
FAX:  (612) 436-1801
mjohnson@johnsonbecker.com
kpearson@johnsonbecker.com

***Attorneys for Plaintiffs***

DATED:    May 29, 2024